IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

HARVEY G. ISBELL,           }
                              }
     Plaintiff,       }
                              }    CIVIL ACTION NO.
v.                     }    06-AR-0334-S
                              }
HARSCO CORPORATION, d/b/a  }
IKG INDUSTRIES,        }
                              }
     Defendant.

**MEMORANDUM OPINION**

The court has for consideration the motion of defendant, Harsco Corporation, d/b/a/ IKG Industries ("IKG"), for summary judgment on the above-entitled action brought by plaintiff, Harvey G. Isbell ("Isbell"), under the Family Medical Leave Act ("FMLA") for interference and for retaliation. Also before the court is IKG's motion to strike portions of the affidavit of Wayne Cook, which was filed by Isbell. For the reasons that follow, the court will grant in part and deny in part IKG's motion for summary judgment, and will deny IKG's motion to strike.

*Summary Judgment Facts*[1]

IKG is a company that manufactures and distributes steel and aluminum bar grating for use in industrial applications. Isbell, who formerly worked at IKG's manufacturing facility in Leeds,

---

[1] Some of the facts material to IKG's motion for summary judgment are disputed. For purposes of this memorandum opinion and the accompanying order, the facts are stated in the light most favorable to Isbell, the non-movant.

Alabama, as a welder, was employed by IKG from May 28, 1996 until his termination on December 29, 2005.

Effective January 1, 2004, IKG implemented an attendance policy under which employees receive a certain number of points for unexcused absences or tardies, for failing to notify IKG of an absence, for failing to punch in or out for a work shift, and for leaving work early. IKG's stated policy is not to assess attendance points for FMLA-covered absences. Whether or not IKG followed that policy under FMLA with regard to Isbell is the subject of this dispute.[2] Pursuant to the point system, the number of attendance points an employee accumulates in any rolling twelve-month period dictates the type of discipline IKG issues. Specifically, IKG's attendance policy states that:

1. If an employee accumulates more than (8) points in (12) rolling month period . . . 1st Written Warning

2. If an employee accumulates more than (11) points in (12) rolling month period . . . 2nd Written Warning

3. If an employee accumulates more than (13) points in (12) rolling month period . . . 3rd Written Warning

4. If an employee accumulates more than (15) points in (12) rolling month period . . . Termination

Todd Whitecotton, the former Plant Manager at IKG's Leeds facility, calculated the employees' attendance points and enforced

---

[2] The FMLA entitles any eligible employee with a serious health condition, or who has a family member with a serious health condition, to take a certain amount of unpaid leave work each year. *See* 29 U.S.C. § 2612; *infra* pp. 11-12.

the attendance policy while Isbell was an employee.  To calculate attendance points, Whitecotton relied on an employee's weekly timecards, which contained supervisors' handwritten notations explaining any absences for a particular week.  For example, vacation days were noted on the timecard as "VAC," unexcused absences were identified as "ABSENT," and FMLA leave was noted as "FML" or "FMLA."  There is no evidence, however, to suggest that each and every employee absence was properly accounted for with the appropriate timecard notation.  Before an employee could pick up his or her weekly paycheck, the employee had to sign the timecard for the corresponding pay period.  Not all employees understood that before signing their timecards, they were supposed to verify the correctness of the absence notations.

IKG required all employees, including employees who had been approved to take "intermittent" FMLA leave — i.e., leave not for one prolonged period, but for occasional, short periods due to the particular medical condition at issue — to notify IKG of any absence.  For garden-variety absences, and for FMLA-excused absences prior to March 10, 2005, employees were to call a voicemail box dedicated to receiving absence or tardy reports.  On March 10, 2005, in order to ensure that it kept proper documentation, IKG implemented a new procedure for employees' taking FMLA leave.  In addition to reporting absences to the voicemail box, employees were to complete a "Family and Medical

3

Leave Absent Request Form" for each period of leave that they wanted to take under the FMLA.

Whitecotton had agreed with the employees' union to post a weekly summary of each employee's attendance points, but he posted the summaries only sporadically.  An employee who disagreed with his or her point total was supposed to raise the issue with Whitecotton.  Whitecotton was then supposed to review the particular employee's timecards and recalculate the points if he determined that the employee's attendance points were incorrect as posted.  In other words, Whitecotton was to correct any mistakes.

On multiple occasions during Isbell's employment, IKG approved intermittent FMLA leave for Isbell, both for his own health condition and for the health conditions of his wife and children. For aught appearing, IKG does not dispute that these health conditions were "serious" for purposes of the FMLA.  IKG first approved FMLA leave for Isbell on September 9, 2003, so that he could care for a child with serious health problems.  In early October 2003, Isbell sought FMLA leave for his own health condition and submitted a medical certification dated July 29, 2003, stating that he suffered from "stomach ulcers" and "tension headaches." On October 6, 2003, IKG informed Isbell that based on his medical certifications, his conditions were not "serious health conditions" and that they therefore did not qualify him to take FMLA leave.  On October 21, 2003, Isbell submitted another medical certification

which clarified that Isbell suffered from "stomach ulcers, with gastrointestinal bleeding," and from "tension headaches" and "migraine headaches." Based on this revised submission, IKG approved Isbell's second request for FMLA intermittent leave on October 23, 2003. Isbell took FMLA leave in 2003, and IKG did not assess attendance points against him for those absences.

On January 9, 2004, IKG approved Isbell's third request for FMLA intermittent leave, which Isbell again submitted for his serious health condition. IKG approved Isbell's fourth request for FMLA intermittent leave on November 9, 2004, for the same serious health condition: "stomach ulcers, with upper gastrointestinal bleeding," "tension headaches," and "migraine headaches."

On November 11, 2004, two days after it granted Isbell's fourth FMLA request, IKG granted Isbell's fifth request for FMLA leave. Isbell submitted his fifth request so that he could care for his son, who suffered a ruptured appendix. Isbell took FMLA leave throughout 2004 pursuant to the intermittent-leave requests that IKG had granted, and IKG did not count these absences toward Isbell's attendance-points total. On August 19, 2005, IKG approved Isbell's sixth request for FMLA leave, which Isbell submitted so he could take care of his wife, who had a serious health condition. IKG approved Isbell's seventh request for FMLA intermittent leave on September 29, 2005, so Isbell could care for his son who underwent knee surgery.

On October 4, 2005, IKG gave Isbell a new form entitled "Certification of Health Provider" so that he could recertify his own serious health condition.  An approved FMLA-leave request remained current for one year, so Isbell was required to recertify his health condition on or around November 9, 2005.  On October 26, 2005, LaDonna Isbell (no relation to plaintiff Isbell), who was the IKG Plant Administrator, reminded Isbell that he needed to recertify his serious health condition.  Isbell eventually did submit a new medical recertification shortly after November 2, 2005, and on November 23, 2005, IKG re-approved Isbell's request for FMLA intermittent leave for his own serious health condition.

Isbell was absent from work on October 31, 2005 and on November 1, 2005 because he was sick to his stomach and had a sore throat.  He did not call in sick on October 31, 2005 because, he says, he was unable to speak and thought that he was not permitted to have someone else call for him.  He did call in to report his absence on November 1.  As a result of Isbell's October 31, 2005 and November 1, 2005 absences, IKG assessed Isbell three attendance points for each day.  Upon returning to work on November 2, 2005, Isbell received a "2nd Written Warning" as described in IKG's attendance policy.  The warning stated that Isbell had accumulated 13 points.  Although six of these points were due to Isbell's October 31, 2005 and November 1, 2005 absences, the notice that Isbell received did not itemize the attendance-policy violations

that contributed to his 13-point total.  Isbell refused to sign the notice because he disagreed with the number of attendance points with which he had been assessed.  A memorandum dated November 2, 2005 from Whitecotton and Plant Superintendent, Butch Jones, stated:

> Mr. Isbell will receive his 2nd warning on November 2, 2005 in accordance with Attendance Policy dated 12-15-03. Noted below are the occurrences:
>
> Mr. Isbell has been absent or has failed to punch in or out on the following dates:
>
> | | | |
> |---|---|---|
> | 03/15/2004 | Absent | +3 points |
> | 04/08/2004 | Failed to punch | +2 points |
> | 05/07/2004 | Failed to punch | +2 points |
> | 05/12/2004 | Failed to punch | +2 points |
> | 07/09/2004 | Failed to punch | +2 points |
> | 08/24/2004 | Failed to punch | +2 points |
> | 10/25/2004 | Removed (2mth) | -2 points |
> | 12/25/2004 | Removed (2mth) | -2 points |
> | 02/08/2005 | Absent | +3 points |
> | 03/16/2005 | Removed (1 yr.) | -3 points |
> | 04/09/2005 | Removed (1 yr.) | -3 points |
> | 04/28/2005 | Failed to punch | +2 points |
> | 05/08/2005 | Removed (1 yr.) | -2 points |
> | 05/12/2005 | Left Early | +2 points |
> | 05/13/2005 | Removed (1 yr.) | -2 points |
> | 06/21/2005 | Left Early | +2 points |
> | 06/26/2005 | Tardy | +2 points |
> | 07/10/2005 | Removed (1 yr.) | -2 points |
> | 08/25/2005 | Removed (1 yr.) | -2 points |
> | 08/27/2005 | Removed (2mth) | -2 points |
> | 10/17/2005 | Tardy | +2 points |
> | 10/31/2005 | No Call In | +3 points |
> | 11/01/2005 | Absent | +3 points |
> | | **Total** | **= 13 points** |

* * *

Although the memorandum was addressed to Isbell, Isbell says he did not receive a copy of it.

Within a few days of returning to work after his October 31, 2005 and November 1, 2005 absences, without submitting a Family and Medical Leave Absent Request Form, Isbell asked LaDonna Isbell for FMLA leave for his October 31, 2005 and November 1, 2005 absences. Isbell says that although his last-approved intermittent FMLA leave was not set to expire until the following week, LaDonna Isbell told him that he "had to renew [his] FMLA, that it had run out." IKG denies that this conversation took place, but it is undisputed that Isbell never completed an FMLA Form for his October 31, 2005 and November 1, 2005 absences, the submission of which was required under the procedures IKG initiated on March 10, 2005, and of which Isbell was aware. Isbell signed his timecard for the week including October 31, 2005 and November 1, 2005. That timecard contains the handwritten notations "M—NO CALL IN" and "T—ABSENT," respectively, for those two days. Isbell does not agree that his timecard necessarily contained those notations when he signed it.

On December 27, 2005, Whitecotton posted a summary of all employees' attendance points. Although Isbell had not been absent since November 1, 2005, the summary showed Isbell having accrued 15 points — two more points than were indicated in Isbell's second written warning of November 2, 2005. Isbell told Whitecotton that he believed his points on the December 27, 2005 posting were incorrect. Whitecotton asked Isbell if he was "challenging" him, and Isbell responded that he was. Whitecotton then told Isbell,

"if I go back and pull everything, I'm going to send your butt home."  Whitecotton warned Isbell that he would fire him if, after reviewing the timecards and recalculating the attendance points, he discovered that Isbell actually had accumulated more than 15 points.[3]  Isbell then asked Whitecotton to recalculate his points. Although he told Whitecotton that he thought his point total was "not right," he did not mention to Whitecotton at the time that he believed some of the absences that contributed to the 15 disputed points should have been counted as FMLA leave.  When Whitecotton recalculated Isbell's points, he concluded that Isbell had accumulated not 15, but 17, points, and that Isbell should therefore be terminated.

On December 29, 2005, Isbell met with Whitecotton, Jones, and members of the workers'-union committee.  At this meeting, Whitecotton and Jones fired Isbell.  The stated reason for Isbell's termination was that he had accumulated an excessive number of points under the attendance policy, but Isbell says that he was actually fired because he had "challenged" Whitecotton two days earlier.  During the meeting, Whitecotton gave Isbell a memorandum listing the specific attendance policy infractions that made up his 17 points, and he also gave Isbell copies of the associated timecards.  The memorandum stated:

---

[3] IKG's attendance policy states that "[i]f an employee accumulates more than (15) points in (12) rolling month period . . . Termination."

Mr. Isbell will receive his final warning (termination notice) on December 29, 2005 in accordance with Attendance Policy dated 12-15-03.  Noted below are the occurrences:

Mr. Isbell has been absent or has failed to punch in or out on the following dates:

| Date | | Points |
|------|------|--------|
| 02/08/2005 | Absent | +3 points |
| 03/28/2005 | Failed to punch | +2 points |
| 05/12/2005 | Left Early | +2 points |
| 06/21/2005 | Left Early | +2 points |
| 07/26/2005 | Tardy | +2 points |
| 09/27/2005 | Removed (2mth) | -2 points |
| 10/17/2005 | Tardy | +2 points |
| 10/31/2005 | No Call In | +3 points |
| 11/01/2005 | Absent | +3 points |
| | **Total** | **= 17 points** |

* * *

Isbell reiterated during the meeting that he thought the 17-point conclusion were incorrect, and he stated that points had been assessed against him for his absences on October 31, 2005 and November 1, 2005, even though he thought those absences should have been counted as FMLA leave.  Isbell never received a "Third Written Warning" as contemplated by IKG's attendance policy.

*Summary Judgment Standard*

In considering IKG's motion, the court must construe the evidence and make factual inferences in the light most favorable to Isbell, the nonmoving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  The court may enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

10

Fed.R.Civ.P. 56(c).  At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted).  This determination involves applying substantive law to the substantive, undisputed facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

*Analysis*

## I. Interference

Isbell claims that IKG interfered with his substantive rights under the FMLA.  The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "Among the substantive rights granted by the FMLA to eligible employees are the right to '12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee,' 29 U.S.C. § 2612(a)(1), and the right following leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an

equivalent position, 29 U.S.C. § 2614(a)(1)." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).  In addition to the right to take leave for an employee's own serious health condition, eligible employees are entitled to take FMLA leave "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  In order to establish an interference claim, a plaintiff must show by a preponderance of the evidence that he was entitled to, but did not receive, one of the substantive rights set forth by the FMLA.  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).  Thus, in order to state a cognizable claim, a plaintiff must allege that he was denied one of these substantive rights.  *Strickland*, 239 F.3d at 1207.

Isbell contends that IKG interfered with his rights guaranteed by the FMLA in three instances.  First, Isbell says that IKG denied him a substantive FMLA right when it did not honor his existing, valid intermittent FMLA leave grant, and when it failed to excuse his absences on October 31, 2005 and November 1, 2005 as FMLA leave.  *See* Pl.'s Am. Br. in Opp. to Def.'s Mot for Summ. J. (Doc. No. 40-2) (herein "Pl.'s Opp."), at 23.  The court agrees that there exists sufficient evidence such that a jury might conclude that IKG denied Isbell the right to take intermittent FMLA leave.  Although Isbell does not dispute that he never made his request in

accordance with the procedure IKG had established — he did not formalize his request on a "Family and Medical Leave Absent Request Form" — there is evidence that LoDonna Isbell incorrectly told Isbell that his leave had run out when he orally asked for FMLA leave to cover his absences.  A jury could conclude that this apparent misrepresentation — even if it was an unintentional one — constituted a denial of Isbell's substantive FMLA right.  Moreover, there is evidence Isbell raised the issue of FMLA leave at his termination meeting, and a jury might conclude that IKG's proceeding with his termination in spite of that fact constituted a denial of his FMLA rights.  Although it would be equally reasonable to conclude that since Isbell never completed the FMLA Request Form (with which, given his frequent use or possible abuse of FMLA leave, Isbell was undoubtedly familiar), he could not have been "denied" FMLA leave because he never requested it, this is an issue of fact that a jury must decide.

Isbell next says that IKG denied him an FMLA right when it did not retroactively allow him to take FMLA leave for his October 31, 2005 and November 1, 2005 absences "after its employees knew, or should have known, [Isbell's] absences were probably FMLA related, on alleged grounds that [Isbell] did not specifically request FMLA leave for these days."  *Id.*, at 24.  The court is unable to ascertain any meaningful distinction between this alleged act of interference and the one just discussed.  If, however, Isbell is

arguing that IKG — not he — was the one responsible for matching his absences with his no-less-than seven FMLA-leave requests that IKG had approved, the court respectfully disagrees.

Third, Isbell contends that IKG denied his right to reinstatement when it fired him within two months after the October 31, 2005 and November 1, 2005 absences, on the basis of charging him attendance-policy points for absences that he says should have been excused as FMLA leave. *Id.*, at 26. The court respectfully disagrees with Isbell on this third point. There is no evidence to suggest that IKG in any way changed the scope of Isbell's duties when Isbell returned to work on November 2, 2005, after being absent for two days. Upon returning to work, Isbell worked in the same capacity as he had previously worked, and he continued to do so for almost two more months. It was not until late December that Isbell was subjected to an adverse employment action, when he was terminated for having accrued too many attendance points, six of which were attributed to the two absences in question.

In addition to his three main arguments, Isbell attempts to support his interference claim by contending that he had a substantive right protected by the FMLA to inquire as to whether he had improperly received attendance policy points for time off that should have been excused as FMLA leave, and that this right was constructively denied when Whitecotton said he would "send the plaintiff's butt home" if he made such an inquiry. *Id.*, at 27.

14

Despite Isbell's characterization of the FMLA, nowhere in the text of the statute is there a right to force an inquiry about attendance points, and there is no evidence that Isbell made any mention of the FMLA or FMLA leave when he approached Whitecotton on December 27, 2005.

IKG argues that the fact that Isbell actually stayed at home on October 31, 2005 and November 1, 2005 necessarily implies that he could not have been "denied" a substantive right created by the FMLA.  This is not a persuasive argument.  It was not essential for IKG to have literally forced Isbell to come into work in order for it to have denied Isbell his substantive FMLA rights.  It is undisputed that Isbell's absences on October 31, 2005 and on November 1, 2005 were not counted as FMLA leave, despite the (disputed) fact that Isbell requested them to be so covered.  If IKG had excused those absences as being FMLA-covered, Isbell would not have accumulated enough attendance points to warrant being terminated under any reasonable interpretation of IKG's written attendance policy.  Since Isbell was nevertheless terminated, a jury could conclude that IKG interfered with his substantive FMLA rights.  IKG's motion for summary judgment on Isbell's interference claim will therefore be denied.

## II. Retaliation

Isbell claims that IKG retaliated against him in violation of the FMLA when it fired him on December 29, 2005.  In order to state

a claim for discriminatory retaliation, a plaintiff must present evidence showing that: (1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision. *See Strickland*, 239 F.3d at 1207 ("a plaintiff bringing [an FMLA] retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'") (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).

The court agrees with IKG that Isbell cannot establish the third element of discriminatory retaliation.  Even if Isbell had engaged in statutorily protected conduct on October 31, 2005 and on November 1, 2005, there is no evidence of any causal connection between such conduct and Isbell's termination.  Isbell claims that on December 27, 2005 — almost two months after the absences — Whitecotton posted a summary of his attendance points.  Isbell then told Whitecotton that he thought his points were incorrect, and Isbell himself says that Whitecotton responded by saying "**if I go back and pull everything**, I'm going to send your butt home" (emphasis added).  Isbell nevertheless asked Whitecotton to review his points, and Whitecotton concluded (whether correctly or incorrectly, *see infra* n.4 and accompanying text) that Isbell had accumulated more than 15 attendance points and was therefore due to

be terminated.  Importantly, Isbell does not deny that when he spoke to Whitecotton on December 27, 2005 — the day that Whitecotton decided to fire him — he made no mention of his belief that any of his absences should have been covered by the FMLA. According to Isbell's rendition, Whitecotton fired Isbell because he had to "go back and pull everything" or because he though Isbell had "challenged" him — not because Isbell had been absent or attempted to take FMLA leave on any particular day.  There is therefore no causal connection between the purported statutorily protected conduct and the adverse employment action that Isbell sustained.  "Challenging" Whitecotton, if that is what Isbell did, was not FMLA-protected conduct.

In an attempt to establish a causal connection between statutorily protected conduct and his termination, Isbell advances four arguments, but each of them is unavailing.  Isbell first argues that Whitecotton resented him because he thought that Isbell had abused FMLA leave.  Isbell offers the following "statements of fact" in support of this argument.  *See* Pl.'s Opp., at 13-16, 28.

- Whitecotton told Jones that he was too soft on people, and also complained to him about employee absences being too high.
- Whitecotton had been heard to complain that some employees took advantage of FMLA leave.

- Oscar Jarrett, Whitecotton's boss, had been heard to say that they wanted to get rid of employees who were taking advantage of FMLA leave.

- On September 13, 2005 LaDonna Isbell sent Sandie Mather, a Human Resources Manager who worked in Texas, an email asking if she needed to remind employees that intermittent leave grants would expire in a year, and indicating that Isbell needed to recertify his existing intermittent FMLA leave grant in October 2005.

- On September 14, 2005 LaDonna Isbell complained to Mather, to whom LaDonna Isbell was sending Isbell's intermittent FMLA request information for his son's knee surgery, about Isbell's use of FMLA leave.

- LaDonna Isbell told Mather that Isbell abused FMLA leave, and she complained that he was approved too easily for FMLA leave.

- LaDonna Isbell opined that Isbell would take FMLA leave for five or six weeks while falsely claiming to care for his son.

- Mather indicated she was sympathetic to LaDonna Isbell's accusations in her reply about "the son" and Isbell's and his wife's FMLA letters.

- LaDonna Isbell was not candid when she responded, after being asked if she ever expressed dissatisfaction with Isbell's request for FMLA leave to Harsco personnel, that "[i]t's

possible that [she] complained about filling out paperwork .
. . .”

- Ms. Isbell was not candid when she said that “[i]f I said
anything about doing [Isbell's] paperwork . . . . If I said
anything, it wouldn't have had any bearing on whether [Isbell]
got FMLA leave or not.”

- On October 26, 2005, LaDonna Isbell asked Mather's boss when
Isbell would be eligible to reapply for FMLA leave, and she
was told that any future request of Isbell for FMLA leave
would be delayed and/or denied until they received the
Certification of Health Care Provider Form.

- On October 26, 2005, according to LaDonna Isbell, she also
hand delivered to Isbell a letter telling him that his
intermittent FMLA leave grant had exceeded twelve months, and
he had until October 31, 2005 to provide her with the
Certification of Health Care Provider form to renew his
intermittent FMLA leave grant, and not doing so could result
in his future requests for FMLA leave being delayed or denied
until recertification was complete.

- According to the copy of LaDonna Isbell's unsigned October 26,
2005 letter, she also stated that she had earlier given Isbell
a Certification of Health Care Provider form for his doctor to
complete on October 4, 2005.

- It was LaDonna Isbell's practice to have Isbell sign letters she hand delivered to him, and the copy of LaDonna Isbell's October 26, 2005 letter was not signed by Isbell.

- LaDonna Isbell also stated that she did not recall ever telling Isbell that his intermittent FMLA leave grant had run out in October 2005.

* * *

The foregoing is Isbell's own characterization of record evidence, the truth of which is disputed by IKG. Assuming that all of Isbell's averments are based on evidence and are factually correct, they cannot, alone or together, establish that Whitecotton — the only individual who made the decision to fire him — resented Isbell because he thought Isbell abused FMLA leave. Isbell does not deny that it was Whitecotton who made the decision to fire him. There does appear to be evidence that Whitecotton and Jarrett worried about possible abuse of FMLA leave, but Isbell points to no evidence to suggest that either of these individuals harbored specific animus toward Isbell in particular on account of his alleged FMLA abuse, just as there is no evidence to suggest that Whitecotton was aware when he made the decision to fire Isbell of the circumstances surrounding Isbell's October 31, 2005 and November 1, 2005 absences. Although there is evidence that LaDonna Isbell believed that Isbell in particular abused FMLA leave, there is no evidence that she played any role whatsoever in the decision

to terminate him.  In sum, although there is evidence that Isbell did, in fact, abuse FMLA leave, there is no evidence to suggest that such abuse or perceived abuse was a reason for Isbell's termination.

Isbell next argues that he establishes the causal connection necessary to sustain his retaliation claim by showing that he was terminated "for complaining to Whitecotton that his attendance policy points had been calculated incorrectly and/or that his FMLA absences were mischaracterized as unexcused absences." *Id.*, at 28. The FMLA does not establish a general right to complain about "attendance policy points," so even if Whitecotton did fire Isbell in response to Isbell's voicing such a complaint (which may be possible, if not likely), such is not the stuff upon which a successful FMLA retaliation claim can be based.  Moreover, although Isbell advances the supplemental/alternative argument that he was fired for complaining that his October 31, 2005 and November 1, 2005 absences were mischaracterized as being unexcused, the undisputed evidence reveals that this is not the case.  Isbell admits that he did not raise the issue of FMLA when he asked Whitecotton to recalculate his attendance points, yet he contends that Whitecotton decided to fire him at the moment he "challenged" Whitecotton.  There is simply no evidence to support Isbell's argument that he was fired for complaining that particular absences should have been covered by the FMLA.

21

Isbell points to the fact that he claimed during his termination meeting of December 29, 2005 that his October 31, 2005 and November 1, 2005 absences should have been considered FMLA leave, and he argues that this establishes the required causal link for his retaliation claim. Although Whitecotton was present at the termination meeting, Whitecotton and Jones had resolved to fire Isbell before that meeting took place. There is no evidence — only Isbell's speculation — that Whitecotton was aware of Isbell's claim that the two absences in question should have been excused before the decision to terminate him was made.

Third, Isbell argues that even if his attendance-policy points exceeded the maximum allowable number — and it appears they would not have exceeded this number if his October 31, 2005 and November 1, 2005 absences had been counted as FMLA leave — it was unfair to terminate him based on a retroactive recalculation of his points. *See id.*, at 29. It may be true that IKG's firing Isbell based upon a retroactive recalculation was unfair. It may also be unfair that Isbell never received a "Third Written Warning" but was fired nonetheless. A reasonable person might even consider IKG's points-based attendance policy to be so ambiguous and complicated that the entire system is unfair.[4] But even if firing Isbell was unfair, or

_____

[4] Specifically, the policy states that employees receive disciplinary action when they accumulate more than a certain number of points "in (12) rolling month period." But it also provides that "[e]mployees who do not incur any violation of this policy during a two (2) month period will have two (2) points removed from their point accumulation provided that this does not reduce the employee's point accumulation below zero." Therefore, it would be entirely

even if Whitecotton purposely and unfairly interpreted the data with respect to Isbell's absences so that Isbell would be found to have accumulated 17 instead of 15 points, such unfairness provides no basis upon which a reasonable juror could conclude that IKG retaliated against Isbell in violation of the FMLA.  Congress did not adopt the FMLA, the ADA, the ADEA, or Title VII to place upon the courts the office of deciding whether workplace decisions are "fair."  The FMLA is not a comprehensive fairness statute.  It has an express purpose.  It defines a discreet set of rights.  *See generally* 29 U.S.C. § 2601 *et. seq.*  A general notion of employer "fairness" is not among them.

Fourth, and finally, Isbell contends that "there is other substantial evidence that Whitecotton had a retaliatory animus" against him.  Pl.'s Opp., at 29.  The remaining evidence to which Isbell refers is even more attenuated than that which the court has already expressly addressed.  None of it can possibly establish a

---

possible for an employee to accumulate, for example, 18 attendance points in a matter of six days (at three points per absence), but then not be absent for the next eleven months and have his or her point total reduced to 8.  Does this mean that the employee did or did not accumulate more than 15 points in a twelve rolling month period?  Does IKG count only an entire one-year period, or does it also count shorter lengths of time within any given one-year period?  IKG's written policy does not answer these questions.  In arriving at Isbell's 17 attendance points on December 27, 2005, however, the evidence suggests that IKG started the clock with an absence Isbell had on February 28, 2005, but that it did not wait until close of business on February 27, 2005 to determine which, if any, of Isbell's points would eventually fall off under the two-month rule.  The court believes that this ambiguity is the reason that Isbell could have been assessed with either 13, 15, or 17 points under the attendance policy as of December 27, 2007.  *See supra* p.7 (dates listed on November 2, 2005 memorandum from Whitecotton and Jones).

causal connection between Isbell's taking or attempting to take FMLA leave and his termination.

## III. IKG's Motion to Strike

After Isbell filed his evidentiary materials in support of his opposition to IKG's motion for summary judgment, IKG moved to strike portions of the affidavit of Wayne Cook.  Cook was a union official who was present at Isbell's termination meeting on December 29, 2005.  The court has not considered the affidavit in arriving at its conclusion that genuine issues of material fact exist with respect to Isbell's interference claim, and the affidavit contains no material which suggests a genuine issue of fact with respect to Isbell's retaliation claim.  IKG's motion to strike will therefore be denied as moot.

*Conclusion*

The evidence suggests that Isbell likely took advantage of, and even abused, the FMLA system with his repeated requests for leave.  The court doubts that Congress envisioned the creation of a system in which an individual can take piecemeal leave for as many as sixty days each year, so long as he says that the leave is somehow related to one or more of a myriad of his medical conditions or those of his family members.  A system so easy to manipulate would be a such a burden on commerce that the deadweight it creates in the workplace would outweigh the legitimate objectives it advances.  Unfortunately for IKG, Congress did enact

a statute that virtually begs for this very type of abuse, and this court may not step in for its coordinate branch of government and more carefully draft the statute for it.  Isbell is entitled to a trial to determine whether IKG interfered with his substantive rights in violation of the FMLA.  IKG's motion for summary judgment will be denied with respect to Isbell's interference claim, and will be granted with respect to Isbell's retaliation claim.  IKG's motion to strike will be denied as moot.

DONE this 27th day of March, 2007.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE